**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **AMERICAN FEDERATION OF STATE,** | ) | |
| **COUNTY, MUNICIPAL EMPLOYEES** | ) | |
| **LOCAL 1733, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | No. 11-2577 |
| | ) | |
| **CITY OF MEMPHIS,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This action is brought against the City of Memphis (the "City") by Plaintiffs American Federation of State, County, Municipal Employees Local 1733 ("AFSCME"); Communication Workers of America Local 3806; International Association of Fire Fighters Local 1784 ("IAFF"); International Association of Machinists and Aerospace Workers Lodge 3 ("IAMAW"); International Brotherhood of Electrical Workers Local 474; International Union of Bricklayers and Allied Craftworkers Local 5 ("IUBAC"); International Union of Operating Engineers Local 369 ("IUOE"); Memphis Police Association ("MPA"); Operative Plasterers and Cement Masons International Association Local

908; Painters and Allied Trades Local 49; United Association of Plumbers, Pipefitters and Sprinkler Fitters Local Union No. 17; United Brotherhood of Carpenters Local 345; United Union of Roofers, Waterproofers and Allied Workers Local 115 (collectively, the "Unions"); and Essica Littlejohn, in her individual capacity and as representative for all others similarly situated (together with the Unions, "Plaintiffs"). (See Sec. Am. Supp. Compl., ECF No. 67) (the "Second Amended Supplemental Complaint.")

Plaintiffs bring suit under 42 U.S.C. § 1983, alleging that the City's unilateral implementation of a wage reduction violated municipal employees' rights under the Fourteenth Amendment to the United States Constitution, and under § 5-4-13 of the City of Memphis Code of Ordinances (the "Impasse Ordinance"). Plaintiffs seek monetary, injunctive, and declaratory relief.

On July 11, 2011, Plaintiffs filed the original complaint. (Compl., ECF No. 1.) Plaintiffs sought and obtained leave to file an Amended Complaint. (ECF No. 49.) On February 14, 2012, the City filed a motion to dismiss the Amended Complaint. (Mot. to Dismiss Am. Compl., ECF No. 51.) On March 19, 2012, Plaintiffs sought and obtained leave to file a Supplemental Amended Complaint. (Mot. for Supp. Am. Compl., ECF No. 54.) On March 23, 2012, the Court granted Plaintiffs' request. (ECF No.

57.) On March 26, 2012, Plaintiffs moved for leave to file the Second Amended Supplemental Complaint. (Mot. for Sec. Am. Supp. Compl., ECF No. 59.) At a scheduling conference on May 2, 2012, the Court granted Plaintiffs' motion for leave to file the Second Amended Supplemental Complaint and denied all pending motions to dismiss as moot. (ECF No. 74.) The Second Amended Supplemental Complaint was entered on May 4, 2012, and added City Mayor A C Wharton as a party. (Sec. Am. Supp. Compl., ECF No. 67.) On March 26, 2013, the Court Granted in Part and Denied in Part Defendants' Motions to Dismiss, dismissing all claims against A C Wharton, who was sued in his individual capacity only. (Order, ECF No. 82.)

Before the Court are the parties' cross-motions for summary judgment. On January 31, 2014, the City filed a Motion for Summary Judgment on all claims. (Def. Mot., ECF No. 125.) The same day, Plaintiffs filed a Motion for Partial Summary Judgment on liability. (Plaint. Mot., ECF No. 110.) The parties filed their responses on March 4, 2014. (Def. Resp., ECF No. 134; Plaint. Resp., ECF No. 131.) The parties replied on March 24, 2014. (Def. Reply, ECF No. 140; Plaint. Reply, ECF No. 139.) For the following reasons, the City's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion is DENIED.

## I. Background

The Unions represent approximately 6,000 City employees. (Plaint. SUMF, ECF No. 112 ¶ 1.) This dispute arises from the City's unilateral implementation of a 4.6% wage reduction in City employees' pay, resulting in wages less than those provided in labor agreements between the City and the Unions. (Def. SUMF, ECF No. 125-3 ¶ 34.) The City and the Unions were parties to agreements, each known individually as a Memorandum of Understanding ("MOU"), during all times relevant to this action. (Plaint. SUMF ¶ 2.) The MOUs set out the terms and conditions of employment for employees in each bargaining unit. (Id.)

### A. Municipal Charter and Impasse Ordinance

On August 16, 1966, the Memphis City Commission adopted Home Rule Referendum Ordinance No. 1852 (the "Home Rule Ordinance" or the "Charter"), which established Memphis as a "Home Rule" jurisdiction under Tennessee law. Memphis, Tenn., Referendum Ordinance No. 1852. The Home Rule Ordinance created a new Charter for the City, enumerating the powers of the various divisions of City government. Under the new Charter, the "legislative power of the City shall be vested in the Council which shall have all legislative powers . . . to approve and adopt all budgets." Id. § 1. The budgets:

> shall be prepared and submitted by the Mayor . . ., and presented to the Council, which shall approve or amend any and all of said budgets prior to the adoption of a tax rate . . ., and said budgets as

> approved or as amended shall be the duly established
> budgets.

Id. § 12.  The Charter vests in the Mayor "the power to contract

. . .; however, all contracts requiring disbursements of funds

shall be limited in an amount not in excess of that provided in

the appropriate budget[.]"  Id. § 14.

On September 5, 1978, the City adopted Referendum Ordinance

No. 2766, which amended the City's Charter.  Memphis, Tenn.,

Referendum Ordinance No. 2766 (the "Charter Amendment").

According to its preamble, the Charter Amendment was prompted by

the "serious threat [to] the lives, property and welfare of the

citizens" of Memphis posed by strikes by City employees.

Ordinance No. 2766 at § 1.  The preamble states that the people

of Memphis:

> desire that all negotiation of employment agreements
> between the City of Memphis and its employees be
> conducted in the spirit of good faith and with the
> intent to reach an equitable agreement in a reasonable
> time.

Id.  The Charter Amendment requires the City Council to pass an

ordinance to:

> set up procedures for arbitration of economic issues
> of municipal labor disputes by the Council or a
> Committee of the Council, and establish rules and
> procedures therefor; provided, however, neither the
> Council nor any Committee thereof shall engage in
> arbitration of economic issues of municipal labor
> disputes unless and until there has occurred an
> impasse on a total economic package, which impasse
> remained deadlocked for seven (7) consecutive days.

Id. § 1(1).

The City instituted the Impasse Ordinance, a procedure to negotiate labor disputes. See Memphis Code of Ordinances § 5-4-13. The Impasse Ordinance establishes arbitration procedures if "total impasse" occurs between the City and its employees. § 5-4-13(A)(1). "Total impasse" is the point during negotiations when "each party declares its last position in economic matters to be final and each party declares such position to be unacceptable, or the parties do not reach agreement by midnight of the negotiations deadline." § 5-4-13(A)(1). All of the "[i]tems, economic or noneconomic, mutually agreed to prior to the declaration of impasse as defined in subsection B of this section shall be made part of any future agreement or memorandum of understanding." Id. § 5-4-13(A)(4). If total impasse lasts for seven days, § 5-4-13 directs each party to submit its "last best offer" to a three-member impasse resolution committee appointed by the City Council. Id. § 5-4-13(B)(1). The committee investigates each party's proposal and recommends final MOU terms for consideration by the City Council. Id. § 5-4-13(B)(2)-(5). The City Council can adopt the committee's recommendations in their entirety or hold a hearing. Id. § 5-4-13(B)(6).

**B. The Negotiations**

In 2008, each of the Unions entered into an MOU with the City that ran from July 1, 2008, through June 30, 2010. (Plaint. SUMF ¶ 3.) Before the expiration of the 2008 MOUs, the Unions voluntarily agreed to extend their terms by one year. (Id. ¶ 4.) The expiration date for the 2008 MOUs changed from June 30, 2010, to June 30, 2011. (Id.)

In late 2010, Gerald Thornton ("Thornton"), the City's Labor Relations Manager, met or corresponded with representatives of the Unions. (Id. ¶ 5.) Thornton advised the Unions that, due to the City's financial situation, it would not be able to negotiate changes in wages for the 2011 MOUs. (Id. ¶ 6.) Thornton advised that the City's labor relations team had no authority to negotiate changes in the "economic" terms of the MOUs. (Id. ¶ 8; Def. SUMF ¶ 28.) According to the Vice President of the MPA, "the City would not seek concessions on wages or benefits" during the negotiations. (Plaint. Ex., Williams Aff., ECF No. 111-15 at 28.)

The negotiations for the 2011 MOUs began in March 2011. (Def. SUMF ¶ 1.) The negotiating sessions were attended by a court reporter, have been transcribed, and are included in the record. (Id. ¶¶ 4-10.) AFSCME negotiated on behalf of five separate bargaining units, IUOE negotiated on behalf of six separate bargaining units, and IAMAW negotiated on behalf of six separate bargaining units. (Id. ¶¶ 23-25.)

During the negotiations, the Unions were aware that the City faced a significant budget short fall and was considering furloughs/wage reductions as a means to balance the budget. (Def. SUMF ¶ 26.) As agreed, no party sought to secure changes in wages and benefits during the negotiations, and the City representatives agreed to update the wage rates in the 2011 MOUs to reflect current wages. (Plaint. SUMF ¶ 19.) The City insisted, however, on including a provision that specified there would be no wage increases during the 2011 MOU period. (Id. ¶ 15; Plaint. Resp. SUMF, ECF No. 132 ¶ 28.) The wage provision was silent about the possibility of a wage decrease. Several Union representatives unsuccessfully negotiated for language specifying that there would be no furloughs or wage reductions during the MOU period. (Def. SUMF ¶¶ 30-31.)

The City did not concede on the wage provision. At the final negotiating session in March 2011, the City and each of the Unions "tentatively agreed" on the language that became binding in the final MOUs:[1] "Effective July 1, 2011 through June 30, 2012, the current wage rates of employees covered by this Agreement will be increased by zero (0%) percent." (Def. SUMF ¶ 10.) (Plaint. Resp. SUMF, ECF No. 132 at 6-7.) The parties could ask to reopen the wage article for negotiations

_____

[1] Plaintiff IAFF did not come to agreement with the City at the same time as the other Unions, but did not dispute the wage rate language. After declaring impasse on a different provision in its MOU and extending negotiations past the filing of the Complaint, IAFF and the City agreed to an MOU materially indistinguishable from the MOUs of the other Unions. (Plaint. SUMF ¶ 15; Def. SUMF ¶ 54.)

while the MOUs were in effect. (Plaint. SUMF ¶ 15.) If negotiations were reopened, they would be "conducted in accordance with the Impasse Ordinance." (Id.)

Throughout the negotiations, the parties repeatedly discussed whether the City's proposed wage provision and the MOUs would limit the City Council's authority to cut wages. For instance, during a negotiating session with the MPA, the MPA pressed Thornton to concede that the City had no unilateral right to reduce wages or implement a furlough without first consulting the Unions. (MPA Neg. Trans., ECF No. 107-1 at 390.) Thornton would not concede the point, stating "I didn't say that. I said that we agreed to no wage increase[.]" Id. The MPA representative replied, "I understand that you are not agreeing to put that [assurance] in the MOU," but "I don't think you have the right to furlough" under the MOU. (Id. at 390-91.) Thornton again would not concede, stating that the City's right to impose a wage decrease was a legal question outside his purview. (Id. at 391.)

In a session with IUBAC, Thornton addressed the possibility that the City would impose a furlough/wage reduction under the 2011 MOUs. (IUBAC Neg. Trans., ECF No. 107-1 at 110.) The IUBAC representative stated:

> Now that the negotiation is concluded, . . . we would like to throw out there and just get an explanation on, the furloughs . . . . Pension furloughs,

9

healthcare, all these things that these employees read
in the paper. And the 12-day furlough is a 5% pay cut
or whatever it works out to. So we know that's looming
over our heads. We just wanted to get your opinion and
explanation[.]

(Id.) Thornton responded:

The furlough, you hit the nail on the head in that it
would -- if we have to go to furlough, it would be a
5 percent pay cut overall . . . . We're hoping that we
can juggle our books such that we won't have any
furloughs, layoffs and the like. We're doing
everything, I promise you, we can to try to avoid
that.

(Id. at 111-12.)

During the negotiation with IUOE, City representative
Antonio Adams stated that "they are not going to get the
reduction," a much contested phrase between the parties that the
Unions assert created a wide belief among Plaintiffs that there
would be no wage decreases under the 2011 MOUs. (IUOE Neg.
Trans., ECF No. 107-1 at 337; ) Moments before, however, Adams
had stated, for "[a]ll employees under the general fund, we are
looking at some level of lay-off, furlough, possible salary
reduction." (Id. at 336.) He also had stated, "[w]e will come
out with a lay-off policy and a furlough. But the commitment has
not been articulated to us at all." (IUOE Neg. Trans., ECF No.
107-1 at 336.) The Unions assert that the City representatives
"indicated" in the final negotiating session that the Mayor had
already approved the terms of the MOUs, suggesting to them that
there would be no wage reductions. (Plaint. SUMF ¶ 20.)

The final negotiation took place on March 31, 2011. (Plaint. SUMF ¶ 28.) Under the schedule established in the Impasse Ordinance, the deadline for declaring impasse in negotiations was April 1, 2011. (Id. ¶ 29; § 5-4-13.) Final agreements were executed by the City and the Unions before the deadline for either party to declare impasse. (Plaint. SUMF ¶ 30.) Other than IAFF, which declared impasse on a provision unrelated to wages and which later agreed to the same wage provision as the other Unions, no party declared impasse and the agreements became final. (Id.)

### C. Budget Process and Wage Cuts

Mayor Wharton presented his proposed operating budget for the 2012 fiscal year on April 19, 2011. (Def. SUMF ¶ 71.) The proposed budget, Ordinance No. 5398, included the elimination of twelve paid holidays for all City employees who earned less than $85,000 per year, the equivalent of a 4.6% pay reduction for those employees. (Plaint. SUMF ¶¶ 32-33.) On the same day he proposed the budget, the Mayor sent an email to all City employees disclosing its terms and its impact on City employees. (Def. SUMF ¶ 41.)

Ordinance No. 5398 was introduced and approved on first reading on May 3, 2011, and introduced and approved on second reading on May 17, 2011. (Id. ¶ 75.) The City Council considered it on third reading on June 7, 2011, and nineteen

11

members of the public were heard. (Id. ¶ 77.) Eleven separate parliamentary motions were made, seconded, and approved by the council, but the 4.6% wage reduction remained. (Id. ¶¶ 68, 77.) The City Council amended the budget on June 7 and June 21, 2011, leaving the 4.6% wage reduction unchanged. (Id. ¶ 68.) On June 21, 2011, the City Council considered Ordinance No. 5398, as amended on June 7, 2011. (Id. ¶ 78.) After hearing from thirty-four members of the public, the City Council approved five additional amendments, again retaining the wage reduction. (Id.) Ordinance No. 5389, as amended, was approved by a vote of nine to three. (Id.; Ordinance No. 5398, ECF No. 41-7.) It included a 4.6% reduction for City employees earning less than $85,000 per year, including those employees covered by the MOUs. (Plaint. SUMF ¶ 35.) The final budget reduced death benefits paid to the families of active employees, also contrary to amounts provided in the final MOUs. (Id. ¶¶ 37, 40.) By memorandum dated July 27, 2011, the City implemented the 4.6% reduction in pay effective on paychecks issued on August 5, 2011. (Id. ¶ 39.)

## II. Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiffs' claim for violating the Impasse Ordinance because

the claim derives from a "common nucleus of operative fact." See 28 U.S.C. § 1367(c); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

## III. Standard of Review

The standard of review for cross-motions for summary judgment is the same as for one party's motion. Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of its case. See Fed. R. Civ. P. 56(c)(1); Asbury v. Teodosio, 412 F. App'x 786, 791 (6th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

When the moving party has made the required showing, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). A genuine dispute exists if a reasonable jury could review the evidence and return a verdict for the nonmoving party. See Wasek v. Arrow Energy Servs., 682 F.3d 463, 467 (6th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The nonmoving party must "'do more than simply show

13

that there is some metaphysical doubt as to the material facts.'" Phelps v. State Farm Mut. Auto. Ins. Co., 680 F.3d 725, 735 (6th Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Reliance on the pleadings is insufficient. See Beckett v. Ford, 384 Fed. App'x 435, 443 (6th Cir. 2010) (citing Celotex Corp., 477 U.S. at 324). Instead, the nonmoving party "must adduce concrete evidence on which a reasonable juror could return a verdict in [its] favor." Stalbosky v. Belew, 205 F.3d 890, 895 (6th Cir. 2000) (citations omitted); see Fed. R. Civ. P. 56(c)(1). The court does not have the duty to search the record for such evidence. See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

On cross-motions for summary judgment, "the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." Wiley v. United States (In re Wiley), 20 F.3d 222, 224 (6th Cir. 1994). The court is not permitted to make credibility judgments or weigh evidence. Ahlers v. Schebil, 188 F.3d 365, 369 (6th Cir. 1999).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored

procedural shortcut." <u>FDIC v. Jeff Miller Stables</u>, 573 F.3d 289, 294 (6th Cir. 2009) (internal quotation marks and citations omitted).

## IV.  Analysis

Plaintiffs claim that the City violated City employees' 14th Amendment rights to procedural due process and the Impasse Ordinance by imposing a 4.6% wage reduction.  Plaintiffs argue that the MOUs' wage terms and statements by City representatives during negotiations created a property right that could only be deprived through the procedures set out in the Impasse Ordinance.  Plaintiffs also argue that the City misled Plaintiffs during negotiations about the City's intent to impose a wage decrease, violating the terms of the Impasse Ordinance and depriving them of a valid opportunity to invoke impasse.

The City argues that the City's passing a budget through a proper legislative process provided City employees all the process due under the Fourteenth Amendment.  The City disputes any violation of the Impasse Ordinance, arguing that it is a procedural mechanism that the Unions chose not to use during the negotiations and is not a basis for challenging the validity of a legislative action taken after agreements were finalized.

### A. Procedural Due Process

Under 42 U.S.C. § 1983, city governments may be held liable for ordinances that violate citizens' Constitutional rights.  42

U.S.C. § 1983.  A municipality violates the Fourteenth Amendment

of the United States Constitution if it "deprive[s] [a] person

of life, liberty, or property, without due process of law."

U.S. CONST. amend XIV, § 1.  To establish a violation of

procedural due process, a plaintiff must prove (1) that she was

deprived of a protected interest, and (2) the deprivation

occurred without due process of law.  See Logan v. Zimmerman

Brush Co., 455 U.S. 422, 428 (1982).

Protected property interests "are not determined by the

Constitution."  Bd. of Regents v. Roth, 408 U.S. 564, 577

(1972); accord Aldridge v. City of Memphis, 404 F. App'x 29, 34-

35 (6th Cir. 2010).

> Rather, they are created and their dimensions are
> defined by existing rules or understandings that
> stem from an independent source[,] such as state law . . .
> rules or understandings that secure certain benefits
> and that support claims of entitlement to those
> benefits.

Id.  The independent source may be a statute, policy, practice,

regulation, or guideline.  Woolsey v. Hunt, 932 F.2d 555, 564

(6th Cir. 1991).  "The rules and understandings need not be a

formal [] system or even an explicit contractual provision;"

they may be implied from the defendant's words and conduct.

Id.; Perry v. Sinderman, 408 U.S. 593, 602 (1972).

If a property right is created by a municipality, the city

may deprive citizens of that right through the legislative

process.  See Logan, 455 U.S. at 432.  "[T]he legislative determination provides all the process that is due."  Id. at 433.  Whether a city's act is "legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998).  An act is legislative in nature if it is an "integral step[] in the legislative process."  Id. at 55.  In Scott-Harris, the city's mayor, Bogan, proposed a budget to the city council that eliminated a department whose sole employee was Scott-Harris.  Id. at 47.  The city council approved the budget, eliminating the position, and Bogan signed it into law.  Id.  The Supreme Court held that:

> Bogan's introduction of a budget and signing into law an ordinance . . . were formally legislative, even though he was an executive official . . . .  Bogan's actions were legislative because they were integral steps in the legislative process.

Id. at 55.

Here, the Court need not decide whether Plaintiffs had a protected property interest in the wage rates set in the MOUs because no reasonable jury could find that City employees were deprived of those wages without due process.  The City's action is a classic example of the legislative process.  Mayor Wharton introduced a budget that included a 4.6% pay cut for City employees making less than $85,000 a year, and the matter proceeded through a valid legislative debate and vote.  The City

Council considered draft budgets with the wage provision for the appropriate period and voted to pass the budget. As citizens, each City employee and member of the Unions had a right to petition the City Council to reject the budget and deny the pay reduction. Many did so. Although they lost, they received "all the process that is due" under the law. <u>Logan</u>, 455 U.S. at 433. The City's Motion for Summary Judgment on Plaintiffs' § 1983 claim is GRANTED.

### B. The Impasse Ordinance

Plaintiffs argue that the City violated the Impasse Ordinance by passing a budget that did not fund the wages provided by the agreed MOUs. Plaintiffs contend that the Unions were wrongfully deprived of a fair opportunity to declare total impasse over the MOUs' wage terms because the Unions were led to believe there would be no reductions in wages during the term of the MOUs.

In passing Ordinance 5398 and imposing a budget cut, the City did not violate the Impasse Ordinance. Like a statute, an ordinance should be read "in the context of the entire act[], without any forced or subtle construction[.]" <u>Oliver v. King</u>, 612 S.W.2d 152, 153 (Tenn. 1981). Plaintiffs argue that the City violated the Impasse Ordinance because economic items mutually agreed "prior to the declaration of impasse as defined in subsection B . . . shall be made part of any future agreement

or memorandum of understanding." § 5-4-13(A)(4). Plaintiffs argue that the wage reduction adopted by the City Council changed the mutually agreed terms of the MOUs, violating the requirement that those terms "shall be made a part of any future agreement."

"Any future agreement" does not refer to changes required by a subsequent act of the City Council, after negotiations have ended. The cited provision means that, once a party has declared total impasse, the parties cannot proceed to mediation over the terms of the impasse and then dispute terms on which the parties have already agreed. See § 5-4-13(A)(4). The Unions' construction requires ignoring the words, "prior to **_the_** declaration of impasse." Id. (emphasis added). Because the Unions never declared impasse, the cited provision does not apply.

Plaintiffs' construction would bring the Impasse Ordinance into conflict with the City's Charter. "It is well settled in Tennessee that a municipal charter is mandatory, taking precedence over ordinances and limiting the actions of the municipality's agents, who must follow the charter." Fox v. Miles, 164 S.W.3d 593, 598 (Tenn. Ct. App. 2004). The Charter grants the City Council "all legislative powers . . . to approve and adopt all budgets," and the City Council may amend proposed budgets as it deems fit. See Home Rule Referendum Ordinance

1852 §§ 1, 12. The Charter also expressly limits the Mayor's power to contract to "an amount not in excess of that provided in the appropriate budget." Id. § 14. The Charter Amendment that mandated the creation of an impasse procedure did not sanction any procedure that would undermine the City Council's authority to pass a budget. See Referendum Ordinance No. 2766 § 1. Under the Charter, any terms of the MOUs negotiated by the Mayor's office are conditional on the City Council's willingness to fund those terms. If a provision of the Impasse Ordinance were construed to limit the City Council's power to amend and pass a budget, the provision would be abrogated. Marshall & Bruce Co. v. City of Nashville, 71 S.W. 815, 819 (Tenn. 1903)("[I]f in conflict with an ordinance, the charter must prevail.")

Plaintiffs contend that their position derives from the Charter, arguing that the Charter Amendment requires the City to negotiate in "good faith." According to Plaintiffs, the City negotiated the MOUs in bad faith by agreeing to leave the wage terms alone when the City allegedly knew that it would later cut wages. The provision Plaintiffs cite, requiring "good faith," is in the preamble to the Charter Amendment, not its controlling provisions. See Memphis Street Railway Co. v. Byrne, 104 S.W. 460, 464 (Tenn. 1907) (holding that a preamble to a statute is only useful in construing the statute and is not binding). The

mandate of "good faith" is not present in the Impasse Ordinance. Regardless, the Unions have failed to establish the bad faith they claim. Despite lengthy discovery, there is no evidence that the Mayor promised to present a budget to the City Council that fully funded the wage terms of the MOUs. The record demonstrates that the MOUs were negotiated under the mutual understanding that the City Council might later reduce wages. The MOUs do not preclude a wage reduction. Given the Charter's limitation on the Mayor's contracting powers, all negotiating parties knew or should have known that the terms of the MOUs were contingent on the City Council's passing a budget to fund them.

The City's Motion for Summary Judgment on Plaintiffs' Impasse Ordinance claim is GRANTED.

## V. Conclusion

For the foregoing reasons, the City's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion is DENIED.

So ordered this 21st day of July, 2014.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE